**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ORTIZ and CHRISTINA NEDREBO, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DYSON DIRECT, INC.,<br><br>Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT**<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................3

THE PARTIES........................................................................................................5

JURISDICTION AND VENUE ................................................................................5

FRAUDULENT CONCEALMEANT AND TOLLING.............................................6

SUBSTANTIVE ALLEGATIONS ...........................................................................6

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.......................................................................6

    B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies. ...............................................................................12

    C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website...........................................................20

        1.    The Website Causes the Interception of the Contents of Communications ...................................................................................20

        2.    Google Cookies.....................................................................23

        3.    Adobe Cookies......................................................................29

        4.    The Trade Desk Cookies........................................................34

    D.    The Third Parties Intercept User Communications While in Transit. ...................35

    E.    The Signaling and Addressing Information Intercepted by the Third Parties. ......38

    F.    The Private Communications Collected are Valuable. .........................................39

PLAINTIFFS' EXPERIENCES ..............................................................................41

CLASS ALLEGATIONS ........................................................................................47

CAUSES OF ACTION...........................................................................................49

    First Cause of Action: Invasion of Privacy.........................................................49

    Second Cause of Action: Intrusion Upon Seclusion............................................52

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)..........................................................54

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) .................................57

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation................59

    Sixth Cause of Action: Unjust Enrichment.........................................................63

CLASS ACTION COMPLAINT

Plaintiffs Jose Ortiz and Christina Nedrebo ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Dyson Direct, Inc. ("Defendant" or "Dyson"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1.      This Class Action Complaint concerns egregious violations of consumer privacy and a breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce website (www.dyson.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that, rather than choosing to "Accept All Cookies," they can instead choose to adjust the Website's "Cookies Settings" by clicking or selecting the link to do so, as shown in the following screenshot:

Dyson Cookie Notice

By continuing to use our websites, you accept that cookies may be stored on your device, as outlined in our **cookie policy.**

Cookies Settings          **Accept All Cookies**

2.      Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

CLASS ACTION COMPLAINT

3.      Even after users elect to adjust the Website's cookie settings to reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function, Defendant nonetheless caused multiple third parties—including Google LLC (Google and Google Analytics), Adobe Inc. (dpm.demdex.net), and The Trade Desk, Inc. (adsrvr.org) (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

4.      Contrary to users' express rejection of non-strictly necessary cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiff and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.      This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they adjusted the available settings on the Website's Privacy Preference Center window to reject all non-strictly necessary cookies, including all Targeting, Functional, and Performance cookies. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving

CLASS ACTION COMPLAINT

clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7.    Plaintiff Jose Ortiz is, and was at all relevant times, an individual and resident of Daly City, California. Plaintiff intends to remain in California and makes his permanent home there.

8.    Plaintiff Christina Nedrebo is, and was at all relevant times, an individual and resident of Riverside, California. Plaintiff intends to remain in California and makes her permanent home there.

9.    Defendant Dyson Direct, Inc. is an Illinois corporation with its principal place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11.    The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12.    Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

CLASS ACTION COMPLAINT

**FRAUDULENT CONCEALMEANT AND TOLLING**

15.     The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that, despite rejecting all non-strictly necessary cookies (including Targeting, Functional, and Performance cookies) on the Websites, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiffs could not reasonably have discovered this conduct at the time of their visits to the Website because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' experiences on the Website would have alerted a reasonable user that their selections were not being honored. Plaintiffs lacked the technical expertise and specialized tools necessary to determine whether the Website honored their opt-out selections or instead continued transmitting their data notwithstanding those selections, and they did not discover Defendant's conduct until a later investigation revealed it.

16.     Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's conduct because Defendant affirmatively represented that users could decline or reject all non-strictly necessary cookies, including Targeting, Functional, and Performance cookies, while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs from discovering their claims earlier. Defendant is not prejudiced by the timing of this action, as it has long been on notice of the conduct at issue, including through the July 5, 2024 demand letter describing substantially similar claims. These circumstances, including Defendant's concealment and misleading representations, warrant tolling of the statute of limitations.

**SUBSTANTIVE ALLEGATIONS**

A.     **Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

17.     Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request

- 6 -

CLASS ACTION COMPLAINT

tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

18.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

19.    As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

20.    Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

21.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website

CLASS ACTION COMPLAINT

to identify the device making the requests, and to record a session showing how the user interacts with the website.

22.    First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

23.    A third-party cookie is set by a third-party domain/webserver (e.g., www.google.com; dpm.demdex.net; insight.adsrvr.org, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

24.    As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;
- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

CLASS ACTION COMPLAINT

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

25. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are

CLASS ACTION COMPLAINT

utilized to enhance website performance and generate revenue through data collection and targeted advertising.

26.    Defendant manufactures, markets, and sells consumer appliances and related products under the Dyson brand, including vacuum cleaners, air purifiers, hair-care devices, and other household products. Defendant also owns and operates the Website, which allows visitors to, among other things, obtain information about Defendant's products, compare product features and pricing, locate retail availability, and purchase products online. As users interact with the Website—including by entering information into forms, searching for products, comparing models, selecting products, adding items to shopping carts, clicking links, and navigating webpages—they communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

27.    Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

28.    Defendant explained the third-party cookies it used on the Website as follows in its Cookie Notice:

**Types of cookies used by Dyson**

Cookies fall into two general categories: first party cookies (which we set) and third-party cookies (which are set by third parties).

**First-party cookies**

CLASS ACTION COMPLAINT

These cookies are set by us at Dyson. For the most part, they enable essential functionality on our website. They also include our own Web Analytics cookies, which we use to understand how our websites are used by visitors so that we can improve them.

**Third-party cookies**

Third-party cookies are not set by Dyson, but by selected third parties with whom we work. Some of these third party cookies enable useful services, for example online questionnaires or Live Chat (which lets you ask questions of a Dyson expert). Others may be set by advertising networks we work with to keep track of your browsing activities, so that they can place our online advertisements in the most appropriate places. In the section below on "Managing cookies", we explain how you can change your settings so that third parties (including advertisers) know that you do not want to be tracked.

**Social media cookies**

Some pages on our websites let you share our content through social media sites like LinkedIn, Facebook and Twitter. Sometimes we may embed videos from sites such as YouTube. These sites set their own cookies, which we don't control. Those social media sites may have their own cookies policies, which, if available, would normally be contained on their websites. You should carefully review those cookies policies to make sure that you are happy with them.

Cookies falling within the three categories above can be further categorised depending on if they are session cookies or permanent cookies.

**Session cookies**

These cookies expire when you close your browser (or if you stay inactive for a certain time). They are used on our e-commerce websites so that you can continue browsing without losing what you put in your shopping basket.

**Permanent cookies**

These cookies persist even when the browser is closed. They're used to remember you so that you don't have to re-enter passwords and login information every time you visit a website.

You can find more information about some of the individual cookies we use and the purposes for which we use them here.

**How We Use Cookies**

Many cookies on our websites perform essential functions and enable you to move around our websites and use their features; for example, when you log in to your Dyson account, they remember the information in your account. We refer to these cookies in this policy as "Strictly Necessary Cookies".

- 11 -

Other cookies are not essential but they help us understand how our websites are used by visitors, so that we can improve what we do online. We use Web Analytics tools for this. They look at things like how long our websites take to load, how they are used, and what information visitors to our sites look at most. This helps us to improve the way our websites work, for example, by ensuring that you find what you are looking for easily. They also help identify any parts of our websites that aren't working as well as they should - so we can fix things and make our websites better for you and other users. We refer to these cookies in this policy as "Analytics Cookies".

Additional cookies allow our websites to recognise you when you return to our websites. This enable us to remember choices that you make (such as your user name, language or the region you are in) and provide enhanced, more personal features. We refer to these cookies in this policy as "Functional Cookies".

A further type of cookie lets us know how well our online advertising works, and where we should place our online advertisements. These cookies let us know if one of our advertisements on another website like Google or Yahoo has sent a visitor to a Dyson website.

This type of cookie also helps us reach people who are more interested in Dyson products. So if you visit a Dyson website you may see our advertisements on other sites. This is known as re-marketing or behavioural advertising and is used to make our advertising more relevant to your interests. We refer to these cookies in this policy as "Targeting Cookies".

We also combine information collected from cookies with any records we may have of you as a customer of Dyson. For example, we combine information collected from cookies with personal information you share with us, or information from Dyson products, for the profiling and statistical analysis of product popularity, of your behaviour when you use a Dyson website or of how Dyson products are used.[1]

**B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies.**

29.    When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "By continuing to use our websites, you accept that cookies may be stored on your device, as outlined in our cookie policy." The banner

---

[1] Dyson Cookie Notice (available at https://privacy.dyson.com/cookie-notice) (the "Cookie Notice").

- 12 -

CLASS ACTION COMPLAINT

then purported to provide users the opportunity, rather than choosing to "Accept All Cookies," to instead adjust the Website's cookies settings by clicking or selecting the "Cookies Settings" link, as shown in the following screenshot from the Website:

30.    Plaintiffs and other Website users who clicked or selected the "Cookies Settings" link were then directed to Defendant's "Privacy Preference Center" window. There, Defendant represented, "Because we respect your right to privacy, you can choose not to allow some types of cookies. Click on the different category headings to find out more and change our default settings." Defendant disclosed that its Website used several categories of cookies, which it identified and described as follows:

    a.    "Targeting Cookies" are those "set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites."

    b.    "Functional Cookies" are those that "provide enhanced functionality and personalization" and "may be set by us or by third party providers[.]"

    c.    "Performance Cookies" are those that "count visits and traffic sources" to "help us know which pages are the most and least popular and see how visitors move around the site."

    d.    "Strictly Necessary Cookies" are those "necessary for the website to function and cannot be switched off[.]"

31.    Defendant further represented, by placing an adjustable toggle switch next to each category of Targeting, Functional, and Performance cookies, that users could "choose not to

CLASS ACTION COMPLAINT

allow[,]" or reject, all of these cookies, except for Strictly Necessary cookies, which had no such option and were identified as "Always Active." These representations were as shown in the following screenshots:



CLASS ACTION COMPLAINT





CLASS ACTION COMPLAINT





CLASS ACTION COMPLAINT

32. Plaintiffs and other Website users who adjusted the available toggle switches on the Privacy Preference Center window, thereby indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function, could then continue to browse the Website after clicking or selecting the "Confirm My Choices" button, as the popup cookie consent banner and Privacy Preference Center window disappeared.

33. Defendant's popup cookie consent banner and Privacy Preference Center window led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those used to "build a profile of [user] interests and show [users] relevant adverts on other sites." The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon adjusting the available toggle switches to decline or reject all such cookies.

34. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users adjusted the available toggle switches to decline or reject all non-strictly necessary cookies, including all Targeting, Functional, and Performance cookies, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

35. Nevertheless, even after receiving that notice, Defendant caused third-party tracking cookies, including the Third Parties' cookies, to be placed on Website users' browsers and devices and/or transmitted to the Third Parties, which enabled the Third Parties to collect user data in real time that discloses Website visitors' Private Communications, including

- 17 -
CLASS ACTION COMPLAINT

browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to the Third Parties, enabling them to track user behavior and communications.

36.    Some aspects of the operations of the Third-Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshot, obtained using one such tool, shows examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties, even after the user adjusted the available toggle switches on the Website's Privacy Preference Center window to reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function:



CLASS ACTION COMPLAINT

37.    The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.dyson.com. The screenshot depicts only network traffic occurring *after* the user rejected all such cookies using the settings available in the Privacy Preference Center window. As shown above, despite the user's rejection of all such cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third-party web domains like www.google.com, dpm.demdex.net, insight.adsrvr.org, and others. As further shown in the right-hand column of the screenshot, the user's browser sent cookies along with those HTTP requests to the third parties. The screenshot demonstrates that the Website caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all such cookies and tracking technologies by adjusting the available toggle switches in the Privacy Preferences Center window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all such cookies.

38.    Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

39.    As users interact with the Website, even after adjusting all available toggle switches, thereby declining or rejecting the use of cookies and similar technologies for personalized content, targeted advertising, and performance analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data.  The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track

and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

40.    The Third Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

C.    **The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website.[2]**

1.    **The Website Causes the Interception of the Contents of Communications**

41.    The Website includes search bars and other input fields through which users enter information. For example, below is a screenshot of the search bar currently available on the Website where users can type into the search box to cause the Website to search its contents. The search bar allows users to search for specific "products and parts[,]" as shown in the

---

[2] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had adjusted the available toggle switches to decline or reject all cookies and tracking technologies in use on the Website, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function.

CLASS ACTION COMPLAINT

following screenshot:



42.    When users input the information into this search field, they intend to communicate the contents of their searches directly to the Website.

43.    Instead, Defendant programmed the Website such that the contents of those communications are transmitted to, and intercepted by, the Third Parties while the communications are in transit between users' browsers and the Website.

44.    For example, the Website causes users' search queries to be transmitted to third parties, including The Trade Desk, even after users have rejected all non-strictly necessary cookies, including all Targeting, Functional, and Performance cookies. When a user submits a search, the Website loads a results page that includes the user's query in the URL. The Website then transmits that URL to third parties, thereby disclosing the full search query to those parties. For instance, a test search string or phrase ("shampoo vacuum") was transmitted to The Trade

CLASS ACTION COMPLAINT

Desk's insight.adsrvr.org domain, along with associated identifiers and metadata as shown below:



GET   200   https://insight.adsrvr.org/tra(
uum%26referrerPageUrl%3Dhttps%3A

Request   Header   Query   Body   Cookies   Raw   Summary   +

| Key | Value |
| --- | --- |
| TDCPM | CAESEgoDYWFtEgsI6v7E4pW69zwQBRIX<br>CghhcHBuZXh1cxILCLjT8-<br>aVuvc8EAUSFgoHYmx1ZWthaRILCMrRxeK<br>Vuvc8EAUSFgoHcnViaWNvbhILCObOkpG<br>Wuvc8EAUSFQoGZ29vZ2xIEgsIIPGSkZa6<br>9zwQBRIUCgV0YXBhZBILCOKi_8rru_c8E<br>AUSFQoGY2FzYWxIEgsIns_Jx5a69zwQBR<br>IWCgdhZGR0aGIzEgsI6vHJx5a69zwQBRI<br>YCglhZGFkdmlzb3ISCwi-<br>IsrHIrr3PBAFEhcKCHB1Ym1hdGIjEgsIooC<br>O55q69zwQBRIWCgd5am4wZ3VwEgsIuv<br>Srrpu69zwQBRIWCgdsaHdiazU5EgsIpKGs<br>rpu69zwQBRIWCgdkMHRybzFqEgsIvMysr<br>pu69zwQBRIWCgc0aDN5bjFmEgsIpujpqr<br>C69zwQBRIbCgxzaGFyZXRocm91Z2gSC<br>wi-<br>neqqsLr3PBAFEhYKB3gyZTd0cTgSCwjY0<br>uqqsLr3PBAFEhgKCW1vb2tpZS1wcxILCN<br>Lhvofwvfc8EAUSGAoJY3Jvc3N3aXNlEgsI<br>8oW2jPC99zwQBRIXCghsaXZIcmFtcBILC<br>N71747wvfc8EAUSFgoHdmN4bHprehILC<br>Orrg5Lwvfc8EAUSFgoHNnN6aGI0ahILCIT<br>x_q3zvfc8EAUSGQoKbGI2ZWludGVudBIL<br>CNzx4bLzvfc8EAUSFgoHMWkwNzFuYxIL<br>CPbj_dHzvfc8EAUSGAoJYmlkc3dpdGNoE<br>gsIkLPu1fO99zwQBRIWCgdpbHYwMzd5E<br>gsI8uTQ2PO99zwQBRIWCgdzdng5dDUwE<br>gsIuOix2_O99zwQBRIWCgcwYWljNGIqEgs |
|  | IisLzv_W99zwQBRIWCgdIeGVsYXRIEgsI3P<br>OaxPW99zwQBRIWCgd1ZWQza3ZyEgsI1<br>pmBzva99zwQBRIWCgdzZW1hc2IvEgsI3<br>MCI-fy99zwQBRgFKAMyCwj-w9K3n-<br>f3PBAFQg8iDQgBEgkKBXRpZXIxEAFaB2s<br>0ZXFxcWdgAQ.. |
| TDID | df96b038-9d0f-428c-<br>bbbe-9b524a508988 |

### 2.     Google Cookies

45.     Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all non-strictly necessary cookies, including all Targeting, Functional, and Performance cookies, to and from the **www.google.com** and **ad.doubleclick.net** domains. These domains are associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in

CLASS ACTION COMPLAINT

performing data collection, behavioral analysis, user retargeting, and analytics.[3] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[4] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[5]

46.    Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[6] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

47.    Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that

---

[3] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[4] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[5] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[6] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

CLASS ACTION COMPLAINT

provide insights into [] business[es]."[7] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[8]

48.     Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[9]

49.     For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's advertising domain, at ad.doubleclick.net:

---

[7] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[8] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[9] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

- 26 -

| | |
|---|---|
| attribution-reporting-eligible | event-source, trigger |
| attribution-reporting-support | web=os |
| cookie | ar_debug=1;<br>IDE=AHWqTUlzHb1XmHENLNYmZE2qig1<br>WJjnvHQ_uCOP3uVZJk7Kr0UPrt1Z5UEub<br>MmO7 |
| Host | ad.doubleclick.net |
| priority | i |
| referer | https://www.dyson.com/ |
| sec-ch-ua | "Chromium";v="124", "Google<br>Chrome";v="124", "Not-A.Brand";v="99" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "Windows" |
| sec-fetch-dest | image |
| sec-fetch-mode | no-cors |
| sec-fetch-site | cross-site |
| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64;<br>x64) AppleWebKit/537.36 (KHTML, like<br>Gecko) Chrome/124.0.0.0 Safari/537.36 |
| x-client-data | CJC2yQEIpLbJAQipncoBCKL1ygEIlKHLAQ |

GET 200 https://ad.doubleclick.net/activity;regis 1e4511v882387384z9833267797za200;dc_pre= afvl=Chromium%3B124.0.6367.119%7CGoogle%2 aw=0;pscdl=noapi;s3p=1;~oref=https%3A%2F%

**Request** Header Query Body **Cookies** Raw | Summary + ⊜

| Key | ∧ | Value |
|---|---|---|
| ar_debug | | 1 |
| IDE | | AHWqTUlzHb1XmHENLNYmZE2qig1WJjn<br>vHQ_uCOP3uVZJk7Kr0UPrt1Z5UEubMm<br>O7 |

50.    Google documentation confirms that the "IDE" cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[10]

[10] https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

51.     Further, as shown above, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google.

52.     The "user-agent" corresponds to the device and browser that the user has used to access the Website.

53.     Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

54.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

55.     Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[11]

---

[11] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

CLASS ACTION COMPLAINT

56.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[12] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

### 3.    Adobe Cookies

57.    Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function, to and from the **dpm.demdex.net** domain. This domain is associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products.

58.    These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[13] These cookies enable Adobe to obtain and store at least the

---

[12] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[13] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

CLASS ACTION COMPLAINT

following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[14]

59.    Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[15]

60.    For example, the Adobe software code that Defendant causes to be stored on and executed by the Website user's device causes the following data—including cookie data— to be sent to Adobe's domain at demdex.net after the user rejected non-strictly necessary cookies:

---

[14] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[15] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

CLASS ACTION COMPLAINT

- 31 -
CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT



The "demdex" cookie contains a unique user ID, enabling Adobe to identify the user browsing the Website, and to track that user across multiple domains. Adobe's documentation depicts this as follows:[16]



61.     Defendant represents to Website visitors that the "demdex" cookie is "used to identify users" as shown in the following screenshot from Defendant's Cookie Policy details[17]:

---

[16] Adobe Experience League Documentation: How the Experience Cloud Identity Service requests and sets IDs (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/id-request, last accessed May 19, 2026).

[17] Available at https://privacy.dyson.com/globalcookiepolicy/cookie-details.aspx.

CLASS ACTION COMPLAINT

Name:
demdex

Expiration:
6 months

Type:
permanent

Description:
used to identify visitors

Category:
Performance Cookies

62.     Further, as shown above, the Adobe software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Adobe.

63.     As discussed above with respect to Google, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

64.     Finally, the data sent to Adobe includes the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

**4.     The Trade Desk Cookies**

65.     Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function, to and from the **insight.adsrvr.org** domain. This domain is associated with The Trade

- 34 -

CLASS ACTION COMPLAINT

Desk, Inc., a digital advertising company that offers a cloud-based ad-buying platform that enables businesses to plan, manage, optimize, and measure data-driven digital advertising campaigns.[18] The Trade Desk uses insight.adsrvr.org cookies to collect data on users such as their geographic locations, the type of device users are using, and users' interests as inferred from their web browsing or app usage activity."[19] This data helps The Trade Desk personalize ad content and track users across the internet.[20]

66. The Trade Desk acknowledges that its cookies' ability "to collect, augment, analyze, use and share data relies upon the ability to uniquely identify devices across websites and applications, and to collect data about user interactions with those devices for purposes such as serving relevant ads and measuring the effectiveness of ads."[21]

67. These cookies allow the Trade Desk to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D.    The Third Parties Intercept User Communications While in Transit.**

68. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

---

[18] *See* The Trade Desk, Inc. 2023 Form 10-K (filed February, 15 2024).

[19] *Id.*

[20] *Id.*

[21] *Id.*

CLASS ACTION COMPLAINT

69.     First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

70.     Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[22] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action. This deduplication occurs as the communications are received, before they are stored.

71.     Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

72.     Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

73.     To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that

---

[22] For example, Google's server-to-server API is the **Google Ads Conversion API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

CLASS ACTION COMPLAINT

is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

74.     On information and belief, the Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[23] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[24] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[25] One use for Dataflow is the "[r]eal-time machine learning (ML) analysis of streaming data."[26] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[27]

75.     Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real

---

[23] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.

[24] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.

[25] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

[26] *Id.*

[27] *Id.*

CLASS ACTION COMPLAINT

time while those communications are in transit between the user's browser and Defendant's Website.

### E. The Signaling and Addressing Information Intercepted by the Third Parties.

76. The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiffs' or Class Members' IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

77. The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

78. Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and

specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

79.    Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F.    The Private Communications Collected are Valuable.**

80.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

81.    The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure

and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular vacuum cleaners and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

82.    Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader vacuum cleaner and consumer products market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

83.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[28] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

84.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

85.    By falsely representing consumers' ability to decline or reject non-strictly necessary cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

---

[28] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

**PLAINTIFFS' EXPERIENCES**

**Plaintiff Jose Ortiz**

86.     Plaintiff Ortiz visited the Website to seek and obtain information about Dyson's products, while located in California, on one or more occasions during the last four years. In particular, Plaintiff Ortiz visited the Website to research air purifiers and other household products, including vacuum cleaners and floor-care products, reviewed product features and specifications, browsed product categories, viewed customer reviews, and compared available products and promotions in connection with a potential purchase.

87.     Plaintiff Ortiz's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Ortiz is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

88.     When Plaintiff Ortiz visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to click or select the "Cookies Settings" link. Plaintiff Ortiz viewed Defendant's representation on the popup cookie consent banner that, "By continuing to use our websites, you accept that cookies may be stored on your device, as outlined in our cookie policy." Plaintiff Ortiz also viewed Defendant's additional representation that, rather than "Accept All Cookies," users could instead adjust or manage the cookies settings of the Website by clicking or selecting the "Cookies Settings" link.

89.     Plaintiff Ortiz selected and clicked the "Cookies Settings" link, which caused the "Privacy Preference Center" window to appear. There, Plaintiff Ortiz saw Defendant's additional representations that he could "choose not to allow some types of cookies[,]" including all Targeting, Functional, and Performance cookies, other than those cookies strictly necessary for the Website to function, by adjusting the toggle switches associated with each category. Accordingly, Plaintiff Ortiz adjusted the toggle switches to reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the

CLASS ACTION COMPLAINT

Website to function, confirmed his choices by clicking or selecting the "Confirm My Choices" button, and proceeded to browse the Website.

90.    Plaintiff Ortiz believed that adjusting the available toggle switches on the Privacy Preference Center window found on the Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies, except for those strictly necessary for the Website to function (but inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or other service providers for the purposes of providing personalized content, targeted advertising, and performance analytics).

91.    In adjusting the toggle switches available on the Privacy Preference Center window, Plaintiff Ortiz gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Ortiz specifically rejected, based on Defendant's representations, those cookies used to "build a profile of [user] interests and show [users] relevant adverts on other sites" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Ortiz continue browsing the Website.

92.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, targeted advertising, and performance analytics, to be placed on Plaintiff Ortiz's device and/or transmitted to the Third Parties along with user data, without Plaintiff Ortiz's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Ortiz that he could reject the use and/or placement of all such cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Ortiz believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

93.    Then, as Plaintiff Ortiz continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Ortiz's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant

CLASS ACTION COMPLAINT

nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, targeted advertising, and performance analytics from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Ortiz's Private Communications as Plaintiff Ortiz browsed the Website.

94.     Defendant's representations that consumers could "choose not to allow" or reject all such cookies while Plaintiff Ortiz and users browsed the Website, or at least those involved in providing personalized content, targeted advertising, and performance analytics, were untrue. Had Plaintiff Ortiz known this fact, he would not have used the Website. Moreover, Plaintiff Ortiz reviewed the popup cookie consent banner and Privacy Preference Center window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all such cookies, Plaintiff Ortiz would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

95.     Plaintiff Ortiz continues to desire to browse content featured on the Website. Plaintiff Ortiz would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function. If the Website were programmed to honor users' requests to reject all such cookies and tracking technologies, Plaintiff Ortiz would likely browse the Website again in the future, but will not do so until then. Plaintiff Ortiz regularly visits websites that feature content similar to that of the Website. Because Plaintiff Ortiz does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject cookies and tracking technologies, Plaintiff Ortiz will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a

specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Ortiz is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Christina Nedrebo**

96.     Plaintiff Nedrebo visited the Website to seek and obtain information about Dyson's products, while located in California, on multiple occasions during the last four years. In particular, Plaintiff Nedrebo visited the Website to research replacement parts and product-support information relating to a Dyson product she owned, including troubleshooting issues she was experiencing with the product and reviewing information regarding replacement batteries and related product solutions.

97.     Plaintiff Nedrebo's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Nedrebo is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

98.     When Plaintiff Nedrebo visited the Website, it immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to click or select the "Cookies Settings" link. Plaintiff Nedrebo viewed Defendant's representation on the popup cookie consent banner that, "By continuing to use our websites, you accept that cookies may be stored on your device, as outlined in our cookie policy." Plaintiff Nedrebo also viewed Defendant's additional representation that, rather than "Accept All Cookies," users could instead adjust or manage the cookies settings of the Website by clicking or selecting the "Cookies Settings" link.

99.     Plaintiff Nedrebo selected and clicked the "Cookies Settings" link, which caused the "Privacy Preference Center" window to appear. There, Plaintiff Nedrebo saw Defendant's additional representations that she could "choose not to allow some types of cookies[,]"

CLASS ACTION COMPLAINT

including all Targeting, Functional, and Performance cookies, other than those cookies strictly necessary for the Website to function, by adjusting the toggle switches associated with each category. Accordingly, Plaintiff Nedrebo adjusted the toggle switches to reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function, confirmed her choices by clicking or selecting the "Confirm My Choices" button, and proceeded to browse the Website.

100.    Plaintiff Nedrebo believed that adjusting the available toggle switches on the Privacy Preference Center window found on the Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies, except for those strictly necessary for the Website to function (but inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or other service providers for the purposes of providing personalized content, targeted advertising, and performance analytics).

101.    In adjusting the toggle switches available on the Privacy Preference Center window, Plaintiff Nedrebo gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Nedrebo specifically rejected, based on Defendant's representations, those cookies used to "build a profile of [user] interests and show [users] relevant adverts on other sites" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Nedrebo continue browsing the Website.

102.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, targeted advertising, and performance analytics, to be placed on Plaintiff Nedrebo's device and/or transmitted to the Third Parties along with user data, without Plaintiff Nedrebo's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Nedrebo that she could reject the use and/or placement of all such cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff Nedrebo believe, she did not have a choice about whether third-party cookies would be placed on her device and/or

- 45 -
CLASS ACTION COMPLAINT

transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

103.    Then, as Plaintiff Nedrebo continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Nedrebo's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, targeted advertising, and performance analytics from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Nedrebo's Private Communications as Plaintiff Nedrebo browsed the Website.

104.    Defendant's representations that consumers could "choose not to allow" or reject all such cookies while Plaintiff Nedrebo and users browsed the Website, or at least those involved in providing personalized content, targeted advertising, and performance analytics, were untrue. Had Plaintiff Nedrebo known this fact, she would not have used the Website. Moreover, Plaintiff Nedrebo reviewed the popup cookie consent banner and Privacy Preference Center window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all such cookies, Plaintiff Nedrebo would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

105.    Plaintiff Nedrebo continues to desire to browse content featured on the Website. Plaintiff Nedrebo would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function. If the Website were programmed to honor users' requests to reject all such cookies and tracking technologies, Plaintiff Nedrebo would likely browse the Website again in the future, but will not do so until then. Plaintiff Nedrebo regularly visits websites that feature content similar to that of the Website. Because Plaintiff Nedrebo does not know how the Website is programmed, which can

CLASS ACTION COMPLAINT

change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject cookies and tracking technologies, Plaintiff Nedrebo will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Nedrebo is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

106.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed the Website in the State of California after adjusting the toggle switches in the Privacy Preference Center window to reject all non-strictly necessary cookies.

107.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

108.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

109.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful

CLASS ACTION COMPLAINT

conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

110. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

111. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected cookies, and had their confidential Private Communications intercepted by the Third Parties.

112. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined

CLASS ACTION COMPLAINT

to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

113.   **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

114.   Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

115.   To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

116.   Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the

CLASS ACTION COMPLAINT

knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

117. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "choose not to allow some types of cookies" (and related tracking technologies) before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner and Privacy Preference Center window on the Website, Plaintiffs and Class members chose to reject all cookies and tracking technologies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function, and reasonably expected that their rejection of all such cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected all such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

118. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

119. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic

CLASS ACTION COMPLAINT

information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

120. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

121. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

122. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

123. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

CLASS ACTION COMPLAINT

124.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

125.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Second Cause of Action: Intrusion Upon Seclusion

126.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

127.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

128.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

129.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by

CLASS ACTION COMPLAINT

Plaintiffs and Class members, and, in fact, those Website users specifically chose to reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function.

130. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function, as well as state criminal and civil laws designed to protect individual privacy.

131. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function, when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all such cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

132. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

133. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

134. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well

CLASS ACTION COMPLAINT

as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

135.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)

136.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

137.    California Penal Code § 631(a) provides, in pertinent part:

"Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] [who] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

138.    Defendant is a "person" within the meaning of California Penal Code § 631.

139.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

140.    Each of the Third Parties is a separate legal entity that offers a software-as-a-service and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were

- 54 -
CLASS ACTION COMPLAINT

third parties to any communication between Plaintiff and Class members, on the one hand, and Defendant, on the other.

141. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

142. At all relevant times, the Website caused Plaintiffs' and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

143. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

144. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

CLASS ACTION COMPLAINT

145. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

146. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject cookies using the toggle switches available in the Privacy Preference Center window.

147. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

148. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

- 56 -
CLASS ACTION COMPLAINT

149.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

150.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant.  Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to consumer goods and appliances, including vacuum cleaners. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action**: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)

151.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

152.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

CLASS ACTION COMPLAINT

153.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

154.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

155.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

156.    At all relevant times, Defendant caused pen registers (e.g., the Third-Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and user-agent information), to be transmitted to the Third Parties.

157.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website.

158.    Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by adjusting the available toggle switches in the Privacy Preference Center window.

CLASS ACTION COMPLAINT

159. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class members' IP addresses and user-agent information.

160. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

161. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

162. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

163. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function.

164. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users adjusted the toggle switches in the Privacy Preference Center window to reject all non-strictly necessary cookies, including all Targeting, Functional, and Performance cookies. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to reject all such cookies.

165. Defendant affirmatively chose to deploy a cookie consent banner and Privacy Preference Center window governing the collection, sharing, and use of users' Private Communications on the Website.

166. By implementing the cookie banner and Privacy Preference Center window, Defendant undertook responsibility for ensuring that they accurately communicated users' privacy choices and properly effectuated those choices.

CLASS ACTION COMPLAINT

167.     Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendant's control. On information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications, even after users selected options indicating their choice to disable and/or reject all non-strictly necessary cookies and opt out of the collection, use, sale, and/or sharing of their Private Communications.

168.     Industry documentation for the consent management platforms and Third Parties' technologies used on the Website explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Website. On information and belief, Defendant had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, the Privacy Preference Center window, consent-management functionality, and Third-Party tracking technologies operating on the Website. Defendant had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations.

169.     Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored,

CLASS ACTION COMPLAINT

and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

170.    Industry standards, privacy frameworks, and applicable statutes and regulations, including California's California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See*, *e.g*., California Consumer Privacy Rights Act § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

171.    On information and belief, Defendant either knew its representations regarding users' ability to reject non-strictly necessary cookies and opt out of data sharing were false, lacked any reasonable basis for believing those representations were, or made those representations carelessly and recklessly despite information available to Defendant demonstrating that users' data continued to be collected and transmitted to the Third Parties after users attempted to opt out.

172.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

173.    Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

174.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information,

- 61 -
CLASS ACTION COMPLAINT

interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

175.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

176.    Defendant's representation that consumers could reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function (including cookies "used by [advertising] companies to build a profile of [user] interests and show [users] relevant adverts on other sites") if they adjusted the toggle switches to do so was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Privacy Preference Center window prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that are related to personalization, targeted advertising, and performance analytics, and/or share information with third parties even after they choose to reject all such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

177.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject all such cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

CLASS ACTION COMPLAINT

178.    Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

179.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

180.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Sixth Cause of Action: Unjust Enrichment**

181.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

182.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

183.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could reject all cookies, including all Targeting, Functional, and Performance cookies, other than those strictly necessary for the Website to function, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

184.    Plaintiffs' and Class members' Private Communications have conferred an economic benefit on Defendant.

185.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

CLASS ACTION COMPLAINT

186. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

187. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

188. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

189. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

190. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

CLASS ACTION COMPLAINT

F.      An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.      An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.      For reasonable attorneys' fees and the costs of suit incurred; and

I.      For such further relief as may be just and proper.

Dated: June 26, 2026

**GUTRIDE SAFIER LLP**

/s/ Seth A. Safier
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT